IN the MATTER OF the MENTAL CONDITION OF VIRGIL D.:

VIRGIL D., Appellant-Petitioner,

v.

ROCK COUNTY, Respondent.†

Supreme Court

*No. 93–1540. Oral argument October 12, 1994.—Decided December 21, 1994.*

(Also reported in 524 N.W.2d 894.)

†Motion for reconsideration denied February 22, 1995.

1

3

For the appellant-petitioner there were briefs and oral argument by *Suzanne Hagopian,* assistant state public defender.

For the respondent there was a brief by *Robert D. Heidel,* Deputy Corporation Counsel, Rock County, and oral argument by *Eugene R. Dumas,* Deputy Corporation Counsel, Rock County, Janesville.

Amicus curiae brief was filed by *Thomas E. Dixon* and *Dianne Greenley,* Madison for the Wisconsin Coalition for Advocacy, Inc.

Amicus curiae brief was filed by *Thomas K. Zander, James A. Walrath, Patricia M. Cavey* and *Karen Kotecki,* Milwaukee for the Legal Aid Society of Milwaukee, Inc.

JANINE P. GESKE, J.   The petitioner, Virgil D. (Virgil), requests review of an unpublished decision of the court of appeals dated September 16, 1993, which affirmed an order of the circuit court for Rock County, James P. Daley, Circuit Judge. The circuit court granted a petition to allow the involuntary administration of psychotropic drugs to Virgil on the grounds that, due to his mental illness, Virgil was not competent to exercise informed consent.

The issue before this court is whether the court of appeals correctly interpreted the statutory standard of incompetence found in § 51.61(1)(g)4, Stats., which states that a patient is not competent to refuse medication or treatment if "the individual is incapable of expressing an understanding of the advantages and

disadvantages of accepting medication or treatment, and the alternatives to accepting the particular medication or treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual." Specifically, did the court of appeals correctly conclude that § 51.61(1)(g)4, Stats., merely illustrates one way in which a court may determine that the patient is not competent to exercise informed consent?

We reverse the decision of the court of appeals and hold that § 51.61(1)(g)4, Stats., provides only one standard: a patient may refuse the involuntary administration of psychotropic drugs if, after a psychiatrist has adequately explained the advantages and disadvantages of, and the alternatives to, medication or treatment, he or she is able to express an understanding of the advantages, disadvantages, and alternatives. That standard does not require the patient to also have an appreciation of the nature of his or her mental illness.

Virgil, who suffers from chronic paranoid schizophrenia, has had a long history of mental illness. In fact, he has been institutionalized prior to this case and treated with the psychotropic drug Prolixin.[1] In November, 1992, Rock County (the County) sought to

---

[1] Psychotropic drugs are used in the treatment of mental illness. Known as neuroleptics, drugs such as Prolixin are used to treat symptoms of chronic paranoid schizophrenia. Specifically, " '[t]he purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes.' " *Riggins v. Nevada,* 112 S.Ct. 1810, 1814 (1992) (quoting *Washington v. Harper,* 494 U.S. 210, 229 (1990)).

commit Virgil to the County psychiatric hospital.[2] Both in November, 1992, and February, 1993, the County sought a court order authorizing the involuntary medication of Virgil with Prolixin and other psychotropic drugs. During the first hearing, the examining psychiatrist testified that even though Virgil was capable of expressing an understanding of the advantages and disadvantages of, and the alternatives to, psychotropic medication, he was not competent to exercise informed consent because he did not recognize that he was mentally ill. However, the circuit court found that Virgil was competent to refuse the medication under the standard articulated in § 51.61(1)(g)4, Stats.[3]

---

[2] The record contains a "Statement of Emergency Detention" dated October 28, 1992. According to the statement, Virgil returned to his home following a three-month stay at the Utah University Mental Hospital in Salt Lake City. Upon his return, he met with his case worker at the Community Support Program in Janesville, Wisconsin. During the office visit, Virgil began making threatening statements about killing his landlord, who had begun eviction proceedings for nonpayment of rent.

The case worker took Virgil to see the landlord, in an attempt to resolve the dispute. The landlord refused to accept Virgil's rent payment at that time, and Virgil subsequently made a series of statements to the effect that he was going to kill the landlord and that he was tired of having things taken away from him. Virgil was then taken to the Janesville Police Department, and from there transported to the Rock County Health Care Center for assessment and admission under § 51.15, Stats.

[3] Section 51.61(1)(g)4, Stats., provides:

**51.61 Patients rights. (1)** ... each patient shall:

. . .

(g) Have the following rights, under the following procedures, to refuse medication and treatment:

. . .

6

Three months later, the County again filed a motion requesting a court order to involuntarily medicate Virgil. At that hearing, both the examining psychiatrist and Virgil testified. The psychiatrist concluded that even though Virgil was capable of expressing an understanding of the advantages and disadvantages of, and the alternatives to, the medication, he was not competent to exercise informed consent because he had no insight into his own mental illness.[4] By contrast, Virgil testified that he had taken

---

4. For purposes of a determination under subd. 2 or 3, an individual is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment, and the alternatives to accepting the particular medication or treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual.

The circuit court stated in its decision that:

> I've got to apply the statute as it's read. And the statute says he has got to be able to express an informed—you know, make an informed decision on understanding the benefits and disadvantages of psychotropic medication. It doesn't say whether or not he understands he's suffering from a mental illness.

[4] The examining psychiatrist at the second hearing was required to certify in his written report that, as a result of his personal examination and inquiry, Virgil was not competent to refuse medication or treatment. Before the court is authorized to enter an order stating that there is probable cause to believe that a patient such as Virgil is not competent to refuse medication, it must make the following findings:

(1) The medication will have therapeutic value for the patient;

(2) the medication will not unreasonably impair the ability of the patient to prepare for or participate in subsequent legal proceedings; *and*

Prolixin for four years and that the medication "hindered" him, slowed down his thoughts and chemically "tortured" him. He also stated that he had been committed even while medicated with Prolixin. Based upon the testimony at the hearing, the circuit court then concluded that Virgil was not competent to refuse psychotropic medication.[5]

In its opinion, the court of appeals affirmed the circuit court and held that the standard articulated in § 51.61(1)(g)4, Stats., illustrates but one means by which a court may determine that a patient is not competent to exercise informed consent. Thus, according to the court of appeals, when the circuit court found Virgil to be not competent because he erroneously believed he was not mentally ill, the circuit court correctly ordered forced medication.

---

(3)   because of mental illness, the patient is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained. *See* § 51.61(1)(g)2 and 4, Stats.

The report of the examining psychiatrist includes a series of questions, the responses to which enable the court to make the necessary findings and order.

[5] The circuit court stated that:

> [I]t's clear today that his decision not to accept psychotropic medication is not based upon an understanding of the advantages or disadvantages of [applying] it to him. It's based upon other reasons other than the advantages or disadvantages of the psychotropic medication.

8

## SECTION 51.61(1)(g)4, STATS., ESTABLISHES ONE STANDARD TO DETERMINE COMPETENCY TO REFUSE MEDICATION

We are asked to determine whether § 51.61(1)(g)4, Stats., provides one standard to determine if a patient is competent to refuse medication. The analysis requires the interpretation of a statute, which is a question of law. *State ex rel. Hodge v. Turtle Lake,* 180 Wis. 2d 62, 70, 508 N.W.2d 603 (1993). Questions of law are decided *ab initio* by this court. *Id.* When interpreting statutes, we first look to the language. *Village of Shorewood v. Steinberg,* 174 Wis. 2d 191, 201, 496 N.W.2d 57 (1993). "If that language is clear and unambiguous, our inquiry ends, and we must simply apply that language to the facts of the case." *Id.* It is only when the language is ambiguous that we resort to judicial construction to ascertain and carry out the legislative intent. *Id.*

When the circuit court and the court of appeals concluded that Virgil was not competent to refuse medication under § 51.61(1)(g)4 because he did not have an appreciation of his mental illness, they ignored the plain language of the statute and created another test for competency which the statute neither articulates nor intends. Section 51.61(1)(g)4 unambiguously provides only one standard in order to assess a patient's competency to refuse medication: the patient must be able to express an understanding of the risks and benefits of, and the alternatives to, medication.

Section 51.61(1), Stats., defines "patient" as

any individual who is receiving services for mental illness, developmental disabilities, alcoholism or

9

drug dependency, including any individual who is admitted to a treatment facility in accordance with this chapter or ch. 55 or who is detained, committed or placed under this chapter or ch. 55 . . ..

Once a patient has been admitted or committed to a treatment facility, he or she must be informed of his or her rights, both orally and in writing. Section 51.61(1)(a), Stats. Section 51.61(1)(g) outlines a patient's rights with regard to the refusal of medication or treatment:

(1) A patient may refuse all medication and treatment except when it has been ordered by the court due to the patient's incompetence or when medication is necessary to prevent serious physical harm to the patient or others. *See* § 51.61(1)(g)1, Stats.

(2) Prior to a final commitment order, the court may hold hearings to determine whether the patient is competent to refuse medication or treatment; an assessment of incompetence may result in the administration of medication, regardless of the patient's consent. *See* § 51.61(1)(g)2, Stats.

(3) Following a final commitment order, a patient has the right to exercise informed consent with regard to all medication and treatment, unless the patient has been shown to be not competent to refuse medication or treatment or if the medication is required to prevent serious physical harm to the patient or others. *See* § 51.61(1)(g)3, Stats.

(4) A patient has the right to refuse medication or treatment if he or she is able to express an understanding of the advantages and disadvantages of, and the alternatives to, accepting medication or treatment. *See* § 51.61(1)(g)4, Stats.

■

As a direct result of this court's holding in *Jones v. Gerhardstein,* 141 Wis. 2d 710, 733–35, 416 N.W.2d 883 (1987), the legislature created subsections 3 and 4 of § 51.61(1)(g), granting a patient subject to a final commitment order the same right to refuse medication as a patient detained pending a final commitment hearing.[6] Contrary to the plain meaning of the statute, the court of appeals concluded that sub. 4 of § 51.61(1)(g) is merely illustrative of one way by which a court may determine that a patient is not competent. We conclude that the statute clearly establishes only one standard to evaluate a patient's competency to refuse medication, that is, whether the patient is able to express an understanding of the advantages and disadvantages of, and the alternatives to, accepting medication or treatment. The sole focus of the statutory language is upon the patient's understanding of the effects of a particular medication, not upon that patient's acceptance of the diagnosis of a mental illness.

■

Therefore, before a circuit court can find that a patient is not competent to refuse medication, it must

---

[6] The competency standard in sub. 4 was first articulated in ch. 428, § 98, Wis. Laws of 1977. At that time, it applied only to patients who had been subjected to a final commitment order. As a result of this court's decision in *Jones,* the legislature amended § 51.61(1)(g) and created sub. 4 as part of 1987 Senate Bill 351. Senate Bill 351 was enacted into law as 1987 Wis. Act 366 § 18 and required that the same competency standard which applied to those detained pending a final commitment hearing also applied to those subject to a final commitment order.

be satisfied by clear and convincing evidence[7] that the patient is incapable of expressing an understanding of the risks and benefits of, and the alternatives to, the proposed medication or treatment.

## *WHAT CONSTITUTES AN EXPRESSION OF UNDERSTANDING?*

In *Jones,* this court stated that

the concepts of mental illness and competency are not synonymous. An individual may be psychotic, yet nevertheless capable of evaluating the advantages and disadvantages of taking psychotropic drugs and making an informed decision.

---

[7] The presumption of a patient's competency to refuse medication, absent clear and convincing evidence to the contrary, has remained unchanged since the statute's inception in 1977. Specifically, § 51.20(13)(e), Stats., provides:

**51.20 Involuntary commitment for treatment.** . . .

. . .

**(13)** *Disposition.* . . .

. . .

(e)   The petitioner has the burden of proving all required facts by clear and convincing evidence.

Chapter 880, Stats., employs the same competency standard when an appointed guardian consents to or refuses psychotropic medication on behalf of a ward when, by clear and convincing evidence, that ward has been found not competent to refuse such medication. Section 880.01(7m) defines "not competent to refuse psychotropic medication" to mean that

because of chronic mental illness . . . a person is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the person.

12

*Jones,* 141 Wis. 2d at 728. Both the testimony of Virgil and the examining psychiatrists support the conclusion that Virgil was competent to refuse medication, even if he did not have a full scientific appreciation of the parameters of his mental illness.

For example, Virgil testified at the February, 1993 hearing that, for him, there were no advantages to taking drugs such as Prolixin. Instead, there were many disadvantages, including the fact that when he took the medication it hindered his judgment and chemically tortured him. When asked if he had been involuntarily committed while taking Prolixin, Virgil answered "yes."

The testimony of the psychiatrists at the November, 1992 and February, 1993 hearings was essentially the same and had the effect of validating Virgil's conclusions: Virgil has expressed an understanding of the risks and benefits of, and the alternatives to, psychotropic medication. Clearly, Virgil met the only standard established in § 51.61(1)(g)4. However, the circuit court (at the February, 1993 hearing) and the court of appeals erred when they ignored the statutory standard and placed greater emphasis on the psychiatrists' testimony that Virgil was not competent to refuse medication because he did not have an appreciation of his own mental illness.[8]

---

[8] The examining psychiatrist at the first hearing testified that he advised Virgil of the advantages and disadvantages of psychotropic drugs. He did not discuss the alternatives because he felt that the only alternative for someone with Virgil's illness was no medication. The psychiatrist concluded that even though Virgil was capable of expressing an understanding of the risks and benefits of the medication, he was not competent to make an informed decision because Virgil did not agree with the diagnosis that he was delusional.

When a circuit court is asked to determine a patient's competency to refuse medication or treatment pursuant to § 51.61(1)(g)4, Stats., it must presume that the patient is competent to make that decision. *See* § 51.20(13)(e), Stats. The petitioner has the burden of overcoming that presumption by showing incompetence by evidence that is clear and convincing. *Id.* The petitioner must establish that the patient is unable to express an understanding of the advantages and disadvantages of the medication or treatment, and the alternatives to accepting the particular medication or treatment offered, after the advantages, disadvantages and alternatives have been explained to him or her. *See* § 51.61(1)(g)4, Stats. Ultimately, if the petitioner is unable to meet that burden, the patient retains the right to exercise informed consent with regard to all medication and treatment. *See* § 51.61(1)(g)3, Stats.

In making its decision, the circuit court must first be satisfied that the advantages and disadvantages of, and the alternatives to, medication have been adequately explained to the patient. Second, the court must consider the evidence of the patient's understanding, or the lack thereof, regarding the advantages, disadvantages, and alternatives. The evidence may include the actual testimony of the patient and the

The examining psychiatrist at the second hearing testified that he did in fact discuss the advantages and disadvantages of psychotropic drugs with Virgil, as well as the alternatives to medication. The psychiatrist further stated that even though Virgil had the intellectual ability to express an understanding of the risks and benefits of, and the alternatives to, Prolixin, he was unable to apply that understanding to himself because he did not have an insight into the nature of his illness.

14

examining psychiatrist. Factors which the court should take into account in reaching its decision include:

(a)   Whether the patient is able to identify the type of recommended medication or treatment;

(b)   whether the patient has previously received the type of medication or treatment at issue;

(c)   if the patient has received similar treatment in the past, whether he or she can describe what happened as a result and how the effects were beneficial or harmful;

(d)   if the patient has not been similarly treated in the past, whether he or she can identify the risks and benefits associated with the recommended medication or treatment; and

(e)   whether the patient holds any patently false beliefs about the recommended medication or treatment which would prevent an understanding of legitimate risks and benefits.

The circuit court must maintain the distinction that this court recognized in *Jones* between a patient's mental illness and his or her ability to exercise informed consent. *Jones,* 141 Wis. 2d at 728. The focus of a hearing on the patient's right to exercise informed consent should not be upon whether the court, the psychiatrist or the County believes the patient's decision is the wrong choice. Rather, the focus must be upon whether the patient understands the implications of the recommended medication or treatment and is making an informed choice.

In this case, even if Virgil's decision to refuse to take the Prolixin is a poor choice, it is his to make as long as he understands the implications of that decision. Simply because Virgil disagrees with the recommendation of the examining psychiatrist, he does

15

not lose his right to refuse administration of the drug. The County *still* retains the right to medicate him if an emergency arises. *See* § 51.61(1)(g)3, Stats.

Virgil did not contest the findings of mental illness, dangerousness or treatability[9] when the County initiated commitment proceedings. Rather, he argued that he was competent to exercise informed consent to refuse forced medication with psychotropic drugs. Applying the single standard articulated in § 51.61(1)(g)4, Stats., we conclude that the County failed to prove that Virgil was not competent to refuse medication, because Virgil was in fact capable of expressing an understanding of the advantages and disadvantages of, and the alternatives to, accepting the medication.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court with instructions to vacate the order permitting involuntary administration of medication and treatment.

---

[9] For example, one of the examining psychiatrists testified that Virgil was participating in various programming offered to him, such as crafts, reading, and sessions with the doctor, social workers, and the unit case manager.